SELEY ET AL., APPELLEES AND APPELLANTS, *v.* G. D. SEARLE & CO. ET AL., APPELLANTS AND APPELLEES. (TWO CASES.)

[Cite as Seley v. G. D. Searle & Co. (1981), 67 Ohio St. 2d 192.]

---

(Nos. 80-336 and 80-360—Decided July 15, 1981.)

*Messrs. Dinsmore, Shohl, Coates & Deupree, Mr. Smith H. Tyler, Jr.,* and *Ms. Jane M. Grote,* for Seley et al.

*Messrs. Bieser, Greer & Landis, Mr. David C. Greer, Messrs, Sidley & Austin* and *Mr. William P. Richmond,* for G. D. Searle & Co., *et al.*

*Messrs. French, Marks, Short, Weiner & Valleau, Mr. Roy W. Short* and *Mr. Edward S. Lee,* for Francis J. Froehlich, M.D., *et al.*

SWEENEY, J.

Case No. 80-336.

We turn first to the issues dealing with the alleged liability of Searle, Ovulen's manufacturer and distributor. In *Temple* v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317, this court adopted Section 402 A of the Restatement of Torts 2d dealing with the theory of strict product liability. The first two paragraphs of the syllabus to that case state, in language substantially identical to Section 402 A, that:

"1. One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"2. The rule stated above applies although the seller has exercised all possible care in the preparation and sale of his product, and the user or consumer has not bought the product from or entered into any contractual relation with the seller."

The Seleys sought damages from Searle based on the rule set forth in Section 402 A, with particular emphasis on Comment *k* to that section, which reads:

"*Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs.*** Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk." 2 Restatement of Torts 2d 353-354.

The Seleys do not contend that Ovulen is "defective" due to improper design or manufacture, nor do they contend that the product ingested by Mrs. Seley was contaminated or otherwise impure. They seek recovery on the theory that Searle is strictly liable to them due to the alleged fact that proper warnings were not given by Searle of the risks associated with

ingestion of Ovulen by women with a prior medical history of toxemia during pregnancy.

Under Comment *k,* despite the inherent and unavoidable danger associated with ingestion of many prescription drugs, the seller of such a product is not strictly liable for injury resulting from use of the product *if* the seller has provided adequate warning of all potential adverse reactions inherent in the use of the drug of which it, being held to the standards of an expert in the field, knew or should have known to exist at the time of marketing. *Sterling Drug, Inc.,* v. *Yarrow* (C.A. 8, 1969), 408 F. 2d 978; *Mahr* v. *G. D. Searle & Co.* (1979), 72 Ill. App. 3d 540, 390 N.E. 2d 1214; *Woodill* v. *Parke Davis Co.* (1980), 79 Ill. 2d 26, 402 N.E. 2d 194; *Ortho Pharmaceutical Corp.* v. *Chapman* (Ind. App. 1979), 388 N.E. 2d 541. On the other hand, when the drug manufacturer fails to give adequate warning, the drug may be considered "defective" and *unreasonably* dangerous, thereby subjecting the manufacturer to strict liability for resulting injuries. *Mahr* v. *G. D. Searle, supra; Hamilton* v. *Hardy* (1976), 37 Colo. App. 375, 549 P. 2d 1099.

Where a plaintiff seeks recovery from a drug manufacturer for injuries allegedly sustained as a result of the ingestion of a drug not accompanied by adequate warnings, the jury must determine numerous potentially decisive questions of fact by a preponderance of the evidence. Initially, the fact finder must decide whether the warning provided was "adequate." The question of the adequacy of the warning given in strict liability cases has been deemed to be perhaps the central issue in determining whether the product is unreasonably dangerous within the concept of strict liability as set forth in Section 402 A of the Restatement. *Lawson* v. *G. D. Searle & Co.* (1976), 64 Ill. 2d 543, 356 N.E. 2d 779. Where the fact finder finds that an adequate warning was provided, the action must be determined in favor of the manufacturer irrespective of whether the plaintiff's use of the drug was, in fact, causally connected to the plaintiff's injury, and despite the fact that the product is unavoidably unsafe.

However, neither Section 402 A itself nor Comment *k* thereto gives an indication of how a jury is to arrive at a finding of adequacy.

To fill this void, a substantial number of courts have held that a warning is "adequate" for Comment *k* purposes where, under all the circumstances, it reasonably discloses to the medical profession all risks inherent in the use of the drug which the manufacturer knew or should have known to exist, *e.g., Smith* v. *E. R. Squibb & Sons, Inc.* (1979), 69 Mich. App. 375, 273 N.W. 2d 476; *McEwen* v. *Ortho Pharmaceutical Corp.* (1974), 270 Ore. 375, 528 P. 2d 522; *Sterling Drug, Inc.,* v. *Yarrow, supra; Basko* v. *Sterling Drug, Inc.* (C.A. 2, 1969), 416 F. 2d 417; *Ortho Pharmaceutical Corp.* v. *Chapman, supra.* We join those courts.

The fact finder may find a warning to be unreasonable, hence inadequate, in its factual content, its expression of the facts, or the method or form in which it is conveyed. *Id.,* at page 558. The adequacy of such warnings is measured not only by what is stated, but also by the manner in which it is stated. A reasonable warning not only conveys a fair indication of the nature of the dangers involved, but also warns with the degree of intensity demanded by the nature of the risk. A warning may be found to be unreasonable in that it was unduly delayed, reluctant in tone or lacking in a sense of urgency. *Sterling Drug, Inc.,* v. *Yarrow, supra,* at page 994. A jury may find that a warning is inadequate and unreasonable even where the existence of a "risk," *i.e.,* a causal relationship between use of the product and resulting injury, has not been definitely established. *McCue* v. *Norwich Pharmacal Co.* (C.A. 1, 1972), 453 F. 2d 1033; *Hamilton* v. *Hardy, supra.* Thus, where scientific or medical evidence exists tending to show that a certain danger is associated with use of the drug, the manufacturer may not ignore or discount that information in drafting its warning solely because it finds it to be unconvincing. *Mahr* v. *G. D. Searle & Co., supra,* at page 564.

In the instant case the trial court instructed the jury as follows:

"***[If Searle] made available adequate warnings to the medical profession to summarize medical or scientific information reasonably known or discoverable by said defendants in the exercise of ordinary care at the time Ovulen-21 was prescribed for the plaintiff, the defendants Searle complied with their duty to give warning.

"With respect to the issue of warning, when I use the words 'ordinary care,' I mean the care that a reasonably careful pharmaceutical company would use under circumstances similar to those shown by the evidence."

The Court of Appeals held that this instruction impermissibly incorporated negligence concepts into the jury's consideration of the Seley's strict liability claim, noting that " '***[i]t is of no import whether this drug manufacturer's warning comported with the warning a reasonably prudent drug manufacturer would have given.' " (Quoting from *Hamilton* v. *Hardy, supra,* at page 383.)

Courts have had difficulty in distinguishing negligence claims from those based on strict liability where the sole defect for Section 402 A purposes is asserted to be lack of adequate warnings. See *Basko* v. *Sterling Drug, Inc., supra;* cf. *Hamilton* v. *Hardy, supra.* See, also, McClellan, Strict Liability for Drug Induced Injuries: An Excursion through the Maze of Products Liability, Negligence and Absolute Liability, 25 Wayne L. Rev. 1. The Court of Appeals correctly acknowledged that in strict liability cases the focus is not on the *conduct* of the manufacturer, but on the *condition* of the product. See, *Hamilton* v. *Hardy, supra,* at page 383. Nevertheless, injecting a "reasonableness" element into the determination of the adequacy of warnings provided with an ethical drug does not convert the action to one sounding in negligence.

"***It is sometimes suggested that the failure to give adequate warning***is due to negligence. This of course overlooks the fact that in a section 402 A action the duty is one of strict liability, to which care is irrelevant. *The issue is whether the warning is inadequate, not how it came to be so.*" (Emphasis added.) Green, Strict Liability Under Sections 402 A and 402 B: A Decade of Litigation, 54 Texas L. Rev. 1185, 1211.

We need not, however, determine in this cause whether a new trial in mandated due to the trial court's emphasis in the quoted instruction on the conduct or care used by Searle in preparing warnings to accompany Ovulen, rather than on the warnings actually resulting from those efforts. A plaintiff asserting strict liability claims based on failure to provide adequate warnings not only must convince the fact finder that the

warning provided is unreasonable, hence inadequate, but he also must establish the existence of proximate cause between the drug and the fact of the plaintiff's injury.[1]

In analyzing the proximate cause issue as it relates to failure-to-warn cases we adopt the two-fold approach taken in *McEwen* v. *Ortho Pharmaceutical Corp., supra*.[2] In that case, proximate causation was divided into two sub-issues: (1) whether lack of adequate warnings contributed to the plaintiff's ingestion of the drug, and (2) whether ingestion of the drug constitutes a proximate cause of the plaintiff's injury.

Comment *j* to Section 402 A (2 Restatement of Torts 2d 353) establishes a presumption that an adequate warning, if given, will be read and heeded. In such a situation, the presumption established works to the benefit of the manufacturer. However, where no warning is given, or where an inadequate warning is given, a rebuttable presumption arises, beneficial to the plaintiff, that the failure to adequately warn was a proximate cause of the plaintiff's ingestion of the drug. This presumption, absent the production of rebutting evidence by the defendant, is sufficient to satisfy the first branch of the plaintiff's proximate cause burden. *Ortho Pharmaceutical Corp.* v. *Chapman, supra; Cunningham* v. *Charles Pfizer & Co., Inc.* (Okla. 1975), 532 P. 2d 1377.[3]

In the instant cause the defendants successfully rebutted the presumption. The jury responded in the negative to the following interrogatory: "Do you find from a preponderance of the evidence that Dr. Froehlich was informed by Mrs. Seley of her history of an episode of high blood pressure at the time of her child's birth?" Plaintiffs assert that the Searle warnings

[1] "(1) One who sells any product in a defective condition unreasonably dangerous to the user***is subject to liability for physical harm *thereby caused***." (Emphasis added.) 2 Restatement of Torts 2d 347, Section 402 A.

[2] Although the *McEwen* case was grounded on a theory of negligence, its analysis of the proximate cause issue has been adopted by at least one other court in a strict liability case. *Ortho Pharmaceutical Corp.* v. *Chapman, supra.* Similarly the *McEwen* analysis is consistent with Ohio law. *Temple* v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317; *State Auto Mut. Ins. Co.* v. *Chrysler Corp.* (1973), 36 Ohio St. 2d 151.

[3] See, also, *Reyes* v. *Wyeth Laboratories* (C.A. 5, 1974), 498 F. 2d 1264, at page 1281: "In the absence of evidence rebutting the presumption [that the person to whom the warning is directed would have read any warning provided, and acted so as to minimize the risks], a jury finding that the defendant's product was the producing cause of the plaintiff's injury would be sufficient to hold him liable."

accompanying Ovulen were defective in that they failed to warn that women with a prior history of hypertension associated with pregnancy (toxemia) were subject to a higher risk than other women of experiencing dangerously high blood pressure or stroke as a result of birth control pill use. Because Mrs. Seley failed to disclose to Dr. Froehlich that she had experienced toxemia,[4] even if the warnings had been in the form the Seleys contend to be adequate, Dr. Froehlich could not have related those warnings to her case. Where, as here, an adequate warning would have made no difference in the physician's decision as to whether to prescribe a drug or as to whether to monitor the patient thereafter, the presumption established by Comment *j* is rebutted, and the required element of proximate cause between the warning and ingestion of the drug is lacking. See *Ortho Pharmaceutical Corp.* v. *Chapman, supra,* at page 557; *Vaughn* v. *G. D. Searle Co.* (1975), 272 Ore. 367, 536 P. 2d 1247, at pages 372-373; *Chambers* v. *G. D. Searle & Co.* (D. Md. 1975), 441 F. Supp. 377.

Searle contends that no causal relationship between the warnings and Mrs. Seley's ingestion of the drug exists because of Dr. Froehlich's testimony that he had acquired full knowledge from other sources of the increased risk of hypertension and stroke in women with a history of toxemia. We reject this contention. A warning may serve purposes other than merely filling gaps in the intended recipient's knowledge — one may benefit from being warned or reminded of what he already knows. Similarly, only speculation can support the assumption that an adequate warning, properly communicated, would not have influenced the course of conduct adopted by a physician, even where the physician had previously received the information contained therein.[5] "What

---

[4] Conflicting evidence was adduced on this issue. Mrs. Seley testified that she informed Dr. Froehlich that she had had high blood pressure at the time of delivery, and that she was told that if she had not delivered when she did, she would have gone into convulsions. Dr. Froehlich testified that Angela told him that her labor was normal.

The jury's response to the interrogatory makes it clear that the jury found Dr. Froehlich's testimony to be more credible.

[5] We note also the unlikelihood of a physician, in effect, admitting his failure to remain informed of current medical and scientific developments where such an admission may be tantamount to an admission of malpractice.

the doctor might or might not have done had he been adequately warned is not an element plaintiff must prove as a part of her case." *Hamilton* v. *Hardy, supra,* at page 387. The evidence provided by Dr. Froehlich as to his independently acquired knowledge is insufficient to rebut the presumption established by Comment *j.*

The evidence at trial tended to show that, in addition to preparing warnings for dissemination throughout the medical community, Searle prepared pamphlets containing warnings and use instructions written in lay language and intended for distribution to the ultimate users of the pill. Mrs. Seley received one such pamphlet. The Court of Appeals held that, having voluntarily[6] undertaken to provide such warnings, Searle could be held liable if the warnings failed to convey a full explanation of the risks associated with use of Ovulen, and if Mrs. Seley relied on those warnings. The court therefore held that the trial court erred in withdrawing from the jury consideration of the adequacy of the warnings provided directly to Mrs. Seley by Dr. Froehlich but prepared by Searle. In support of its ruling the court employed the so-called voluntary duty rule. Under this doctrine one who gratuitously undertakes a voluntary act assumes the duty to complete it with the exercise of due care under the circumstances. *Briere* v. *Lathrop Co.* (1970), 22 Ohio St. 2d 166; Prosser on Torts, Section 56, at pages 343-348.[7]

The "voluntary duty" doctrine however, has no application to cases based on failure to provide adequate warnings with prescription drugs, whether grounded in negligence or strict liability. It has become a well established rule in such cases that the manufacturer satisfies his duty to warn of dangers associated with use of the product by providing ade-

---

[6] At the time in question, the federal Food and Drug Administration did not require manufacturers of oral contraceptives to provide warnings directly to consumers. *Cf.* 21 C.F.R. Section 310.501.

[7] See, also, 2 Restatement of Torts 2d 135, Section 323:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

"(a) his failure to exercise such care increases the risk of such harm, or

"(b) the harm is suffered because of the other's reliance upon the undertaking."

quate warnings to the medical profession, and not the ultimate user. *Ortho Pharmaceutical Corp.* v. *Chapman, supra; Hamilton* v. *Hardy, supra; McEwen* v. *Ortho Pharmaceutical Corp., supra; Basko* v. *Sterling Drug, Inc., supra; Smith* v. *E. R. Squibb, supra; Terhune* v. *A. H. Robins Co.* (1978), 90 Wash. 2d 9, 577 P. 2d 975. This rule is based on the theory that a physician acts as a "learned intermediary," standing between the manufacturer or seller and the patient. The patient is expected to place primary reliance upon the physician's judgment, and to follow his advice and instructions as to use of the drug. *Id.* at page 14.

The decision to use oral contraception, although involving a higher degree of patient choice than is generally associated with a prescribing decision, remains a joint one made by both doctor and patient. Informational pamphlets, such as provided Dr. Froehlich by Searle for distribution to his patients in the exercise of the doctor's discretion, can aid in expanding the range of communication between doctor and patient. Similarly, they may contribute to the patient's informed use of the drug while under the doctor's supervision. Nevertheless, a direct relationship between the manufacturer and the patient does not arise as a result of the provision of such brochures. In this case Mrs. Seley did not receive the allegedly deficient informational material directly from the manufacturer, but from her doctor. Although we recognize that the intent of such brochures is to ultimately benefit the user, we do not believe that by preparing such brochures and distributing them to physicians, a prescription drug manufacturer undertakes to render a voluntary service so as to invoke the "voluntary duty" rule set forth in *Briere* v. *Lathrop, supra,* thereby extending the scope of its duty to warn.

For the foregoing reasons, the judgment of the Court of Appeals in case No. 80-336 is reversed.

## Case No. 80-360.

Angela and Peter Seley raise numerous arguments in support of their appeal challenging the dismissal of their action against Dr. Froehlich et al. In general these arguments arise from procedural occurrences at trial.

The Seleys' first and second propositions of law challenge trial court rulings regarding the testimony of Dr. Froehlich as

a witness called by the Seleys as if on cross-examination pursuant to R. C. 2317.07.

After the plaintiffs cross-examined Dr. Froehlich as part of their case-in-chief, counsel for Searle sought to cross-examine the doctor. Plaintiffs objected, asserting that Searle had no right to cross-examine Dr. Froehlich except as to matters adduced by the Seleys' cross-examination which were prejudicial to the defendants Searle. The court overruled the objection and permitted Searle's counsel to fully examine Dr. Froehlich through the use of leading questions. The Seleys contend that, in so doing, the court committed prejudicial error.

The Court of Appeals held that the trial court acted within its discretion in authorizing Searle's cross-examination of Dr. Froehlich, and that the record failed to show an abuse of that discretion. We agree. "The allowing or refusing of leading questions in the examination of a witness must very largely be subject to the control of the court, in the exercise of a sound discretion." *Evans* v. *State* (1873), 24 Ohio St. 458, 462; *State* v. *Wallen* (1969), 21 Ohio App. 2d 27, 36; see, generally, Annotation, Cross-examination by leading questions of witness friendly to or biased in favor of cross-examiner, 38 A.L.R. 2d 952.

We acknowledge the Seleys' argument that the purpose of allowing leading questions is to foster the elicitation of truth from hostile witnesses. In the abstract, where a witness is shown to be friendly to or biased in favor of the cross-examiner, the reason for the rule diminishes. In the instant cause, however, the plaintiffs' original cross-examination was extensive and at the time of objection it was not at all clear that the interests of the drug manufacturer and Dr. Froehlich were mutual. Under these circumstances, and having reviewed the transcript of Dr. Froehlich's testimony, we find no abuse of the trial court's discretion nor reversible error in allowing Searle the use of leading questions during such cross-examination.

Similarly, the trial court's failure to allow the Seleys an opportunity to recross-examine Dr. Froehlich does not constitute reversible error absent a showing of an abuse of discretion. "The control of redirect examination is committed to the

discretion of the trial judge and a reversal upon that ground can be predicated upon nothing less than a clear abuse thereof." *State* v. *Wilson* (1972), 30 Ohio St. 2d 199, 204. See, also, *Fidelity & Guaranty Ins. Underwriters, Inc.* v. *Gary Douglas Electric, Inc.* (1974), 48 Ohio App. 2d 319, 324.

In their third proposition of law, the Seleys assert prejudicial error in the allowance of the opinion of an expert witness in response to an allegedly improper hypothetical question.[8]

[8] "Now, Doctor, I am about to ask you a question, and it will be based on a number of facts. I would like you to assume what I am about to tell you to be fact in the matter, and after I have asked you and stated to you these facts, I will ask you whether or not you have an opinion based upon those facts.

"Assume that, on May 3rd, 1972, Angela Seley came to the office of Dr. Francis Froehlich by appointment. The purpose of her visit was to obtain a yearly checkup, including a Pap smear and pelvic examination, and for obtaining a new prescription for Ovulen contraceptive pills, namely Ovulen 21.

"Assume further, that she had been on this medication for some twelve months prior to this office visit; that the pills had been prescribed for her by the same obstetrician and gynecologist who had delivered her first and only child in February of 1971, in Tulsa, Oklahoma; and that he prescribed such medication at the time of her six-week's check-up, and recommended that she commence taking the pill when she stopped nursing her child. In point of time, that was in May, 1971.

"Assume further, that she regularly took the medication up to her visit with Dr. Froehlich; that he obtained a history from her in which she denied ever having any side effects or symptoms from taking the pill. She denied ever having thrombophlebitis, hepatitis, diabetes and high blood pressure or hypertension.

"She further stated that she was 25 years of age and had a fifteen-month old infant. Her specific complaint was a breast soreness for some three months prior to her visit.

"Her physical examination was essentially normal. She was 5′, 1-¾″ tall, weighed 115 pounds. Her blood pressure was 130 over 70; pulse, 80.

"Her pelvic examination and Pap smear were normal.

"Assume further, that Angela Seley expressed her satisfaction with Ovulen 21, and desired to continue with it. That, as a result of the foregoing history and examination, Dr. Froehlich re-prescribed Ovulen 21 for another twelve months.

"He gave Mrs. Seley a one-month's supply of the pills contained in a package, with a booklet published by the Searle Drug Company called, 'Planning your Family,' which he asked her to read, and which, in fact, she did read.

"And he then instructed her to return in one year for another examination.

"Now, Dr. McLain, assuming all of the foregoing as fact, *and including your examination of the records of the Springer Clinic, St. Francis Hospital, Bethesda Hospital and Good Samaritan Hospital,* and taking into account the education, training and experience as a Board-certified obstetrician and gynecologist, do you have an opinion, based upon reasonable medical probability as to whether or not Dr. Francis Froehlich deviated in any way from the acceptable standards of practice as such standards were accepted and practiced by other obstetrician-gynecologists in this community in May of 1972?" (Emphasis added.)

The syllabus in *Zelenka* v. *Indus. Comm.* (1956), 165 Ohio St. 587, states:

"An expert witness may not express his opinion based upon evidence which he has heard or read on the assumption that the facts supported thereby are true, where such evidence is voluminous, complicated or conflicting or consists of the opinions, inferences and conclusions of other witnesses."

In *Zelenka,* the hypothetical question held to be improper stated no facts expressly, but rather asked the expert to give his opinion based solely on his review of 23 exhibits consisting of hospital records and X-rays. A comparison with the question in this case supports the Court of Appeals' statement that the "hypothetical question in *Zelenka* was far more sweeping" than the question challenged in this case.

The *Zelenka* syllabus is based on the evidentiary rule that "the opinion of an expert witness cannot be predicated either in whole or in part upon the opinions, inferences and conclusions of others, whether expert or lay witnesses." *Id.,* at page 594. We note parenthetically that although this rule has been adopted by a majority of other jurisdictions, it has been subjected to criticism. See, *e.g.,* 2 Wigmore on Evidence 947, Section 682; 2 Jones on Evidence (6 Ed.) 644, Section 14:22; McCormick on Evidence (2 Ed.) 34, Section 15. Without passing on the continued vitality of the *Zelenka* rule, we hold that the questions asked in the two cases are sufficiently distinguishable, and the rule is inapplicable to the instant case. A review of the question challenged herein discloses that the opinion solicited was not one "based upon" evidence contained in hospital records, but rather on the assumed truth of an extensive framework of facts. The hypothetical question framed was fully proper, but for counsel's unfortunate reference to the witness' examination of hospital records. The reversal of a trial of nearly nine-weeks duration on the basis of such a technical objection would require us to unduly emphasize form over substance.

The Seleys' fourth proposition of law asserts that the trial judge committed prejudicial error by absenting himself from the courtroom during the presentation to the jury of a lengthy videotaped deposition of an expert witness. Although a written transcript of the videotape had been reviewed by the court,

the objections contained therein substantially ruled upon, and the videotape edited accordingly, the Seleys assert that the court had no prior opportunity to review charts and other visual aids used as exhibits during the deposition, hence objections relating thereto were not ruled upon by the court prior to presentation of the tape at trial. Immediately prior to the showing of the videotape to the jury the trial judge informed counsel that he did not intend to remain on the bench during its presentation. Despite his absence, counsel for the Seleys made 56 separate objections to testimony in the presence of the jury.

Civ. R. 40 provides:

"All of the testimony and such other evidence as may be appropriate may be presented at a trial by videotape, subject to the provisions of the Rules of Superintendence."

Although not in effect at the time of trial, C. P. Sup. R. 12(A)(15) provides:

"Objections at trial. Objections should be made prior to trial and all objections must be made before actual presentation of the videotape at trial. If an objection is made at trial which has not been waived pursuant to Civil Rule 32(D)(3) or previously raised and ruled upon, such objection shall be made before the videotape deposition is presented. The trial judge shall rule on such objections prior to the presentation of the videotape. If an objection is sustained, that portion of the videotape containing the objectionable testimony shall not be presented."

C.P. Sup. R. 12(B)(4) and (5) provide:

"Objections. All objections must be made and ruled upon in advance of the trial. Objections may not be made during the presentation of the videotape evidence.

"Presence of counsel and trial judge. *In jury trials, counsel for the parties and the trial judge need not be present in the courtroom when the videotape testimony is played to the jury.* If the trial judge leaves the courtroom during the playing of the videotape, he shall admonish the jurors regarding their duties and responsibilities. In the absence of the judge, a responsible officer of the court shall remain with the jury. The trial judge shall remain within such proximity to the courtroom that he can be readily summoned." (Emphasis added.)

208

Civ. R. 32(B) governing the use of depositions as evidence at trial, was in effect at the time the instant cause was tried. It provides, in part:

"***Upon the motion of a party, or upon its own initiative, the court shall decide such objections before the deposition is read in evidence."

No reason has been provided us as to why the visual aids to which appellants objections relate were not available to the trial judge for review with his examination of the videotape transcript. Although we do not disagree with appellants' assertion that parties are generally entitled to the presence of the trial judge during trial, we do not find that his absence from the courtroom under all of these circumstances constitutes reversible error. Cf. *Bobbitt* v. *Maher Beverage Co.* (1949), 152 Ohio St. 246, 250; 75 American Jurisprudence 2d Trial, Section 47; Cf. *Loatman* v. *Patillo* (Del. 1979), 401 A. 2d 91, at page 92 (footnote).

In their fifth proposition of law, the Seleys argue that the trial court erred in its instructions to the jury relating to the alleged negligence of Dr. Froehlich. The jury was instructed as follows:

"In order to obtain a recovery on the claim of negligence presented against the defendants, Francis J. Froehlich, M.D., and C. J. Condorodis, M.D. and F. J. Froehlich, M.D., Inc., the plaintiffs must establish by a preponderance of the evidence each of the following propositions:

"1. That plaintiff's, Angela Seley's stroke was a direct and proximate result of taking Ovulen-21 after it was prescribed by Dr. Froehlich on May 3rd, 1972;

"2. That Dr. Froehlich knew of Angela Seley's prior history of elevated blood pressure and edema, and that if she had delivered her child any later she might have gone into convulsions, because Angela Seley told him of such condition during her office visit on May 3rd, 1972;

"3. That if Dr. Froehlich knew of such prior history, he deviated from the standard of care, as such standard existed and was practiced on May 3rd, 1972 by other Board-certified obstetricians and gynecologists, or by any other physician you find from the evidence had adequate and sufficient knowledge of such standard of care;

"4. That Angela Seley's blood pressure became elevated after Dr. Froehlich prescribed Ovulen-21 and before her stroke on January 26, 27, 1973, and that such elevation was a direct and proximate cause of her stroke;

"5. That, fifth, if Dr. Froehlich had taken Angela Seley's blood pressure before January 26, 27, 1973, her stroke would not have occurred."

The Seleys contend that paragraphs four and five of these instructions placed a greater burden of proof on them than is required by law in that it required the proof of multiple proximate causes. We agree with the Court of Appeals' analysis of this issue, to wit:

"***Even assuming *arguendo* that appellants are correct regarding the charge on negligence, we hold that the jury's answer to the first interrogatory effectively rendered most of the charge superfluous. The jurors answered 'No' to the following interrogatory:

" ' Do you find from a preponderance of the evidence that Dr. Froehlich was informed by Mrs. Seley of her history of an episode of high blood pressure at the time of her child's birth?'

"This finding completely negates appellant's theory that Dr. Froehlich knew of Mrs. Seley's period of high blood pressure and nevertheless prescribed Ovulen for her without due regard for the risks inherent in such a procedure. If, after appropriate questioning by him, Dr. Froehlich was not told of any past episode which would have alerted him to his patient's predisposition to high blood pressure, he cannot be found negligent for failure to take into account such a predisposition in his prescription for his patient."

The Seleys' sixth proposition of law relates to the fact that during the course of its deliberations the jury requested the court to provide it with a written copy of the court's instructions. The court informed the jury that it would not provide such a copy, but would, on the jury's request, reread any portion of the charge desired. Thereafter, the jury did request that certain portions of the charge be reread; however, the exact content of that request does not appear in the record.[9] The

[9] The record does reflect the following comments of the trial court: "***I am going to read the three [instructions] that I have indicated. *I think that should suffice for their question.*** Mr. Botner, [jury foreman] I have your note here that you indicated

court responded by re-reading the portions of the instructions it felt to be responsive to the jury's request.

The Seleys concede that the jury was originally charged on the informed consent issue as requested by them. They contend however, that in response to the jury's request the court could choose only to reread the original charge, *in toto,* or not at all. We find no merit therein.

The Seleys final proposition of law states:

"The trial court should avoid giving any charge which is of such a nature that when construed as a whole it might under the circumstances of the case mislead, confuse, misguide or tend to misdirect the jury in consideration of the issues in the case as shown by the evidence."

We are not in total disagreement with the Court of Appeals' characterization of certain portions of the instructions as contradictory, ambiguously worded and lacking in cohesiveness. Nevertheless, error does not support reversal of a judgment unless such error is prejudicial. *Smith* v. *Flesher* (1967), 12 Ohio St. 2d 107. In this cause, as discussed *supra,* the jury in answer to a specific interrogatory, found that Mrs. Seley failed to inform Dr. Froehlich of her history of high blood pressure during pregnancy. It is highly unlikely that the jury would not have reached the same determinative conclusion had the court's instructions been more clear. Cf. *Hallworth* v. *Republic Steel Corp.* (1950), 153 Ohio St. 349.

For the foregoing reasons the judgment of the Court of Appeals in case No. 80-360 is affirmed.

*Judgment reversed in case No. 80-336.*

*Judgment affirmed in case No. 80-360.*

---

you need to have part of the charge, the plaintiff has to prove [sic]. *I have selected those that I think are appropriate to the question.* I will reread those to you now at this point. [Thereupon the court reread its instructions as to the alleged strict liability of Searle.] "And that is the matter you requested as to strict liability as against Searle." [Thereupon the court reread its instructions as to the alleged negligence of Searle] "So those are the propositions regarding negligence as pertaining to Searle." [Thereupon the court reread its instructions as to the alleged negligence of Dr. Froehlich] "I think that appropriately covers the question that has been related for the moment, and with that, I will ask you to return to the jury room and continue your efforts." (Emphasis added.)

Celebrezze, C. J., Krupansky, P. Brown and Locher, JJ., concur.

Donofrio, J., dissents in case No. 80-336 and concurs in case No. 80-360.

C. Brown, J., dissents.

Krupansky, J., of the Eighth Appellate District, sitting for W. Brown, J.

Donofrio, J., of the Seventh Appellate District, sitting for Holmes, J.

Clifford F. Brown, J.,  dissenting.

## I.

It is my view that the Court of Appeals correctly reversed the jury verdict in favor of G.D. Searle & Company (Searle), in case No. 80-336. At issue is the liability of Searle, in light of *Temple* v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317, in which this court adopted Section 402 A of the Restatement of Torts 2d dealing with the theory of strict liability. The majority opinion acknowledges that the damages sought by plaintiffs from Searle derive from the rule set forth in Section 402 A, particularly Comment *k* of that section. The critical issue for the jury is whether the warning given about the use of Ovulen was adequate in the light of the state of medical and scientific knowledge at the time of manufacture and distribution of the drug. *Mahr* v. *G. D. Searle & Co.* (1979), 72 Ill. App. 3d 540, 390 N.E. 2d 1214;[10] *Hamilton* v. *Hardy* (1976), 37 Colo. App. 375, 549 P. 2d 1099; *Carmichael* v. *Reitz* (1971), 17 Cal. App. 3d 958, 95 Cal. Rptr. 381.

---

[10] *Mahr,* at page 560 holds:

"Unlike an action premised on negligence, the standard by which the law measures liability of a manufacturer sued for strict liability in tort does not relate to reasonableness of due care of conduct under scrutiny. Here the duty is stated in more positive fashion and breach is found in an undertaking which falls short of ordinary considerations of fault."

*Mahr,* at page 563, further holds that "[t]he inadequacy of the warnings [by the manufacturer to the physician]***is a question of fact within the prerogative of the jury."

In *Mahr, supra,* a jury verdict for plaintiff for $100,000 against the same defendant, G. D. Searle & Co., was affirmed by the Illinois Appellate Court.

The jury instructions given by the trial court concerning the liability of Searle permitted the jury to disregard the rule of strict liability, and further permitted the jury to find that Searle was not liable in the absence of negligence on its part.[11]

In giving his instructions to the jury, the trial judge used the term "ordinary care." The concept of ordinary care has no proper place in the theory of strict liability. Its use when discussing strict liability could only confuse and mislead the jury with regard to its duty to determine the liability of Searle.[12]

[11] The jury instruction, in relevant part, was as follows:

"If the defendants Searle made available adequate warnings to the medical profession to summarize medical or scientific information reasonably known or discoverable by said defendants in the exercise of *ordinary care* at the time Ovulen-21 was prescribed for the plaintiff, the defendants Searle complied with their duty to give warning."

"With respect to the issue of warning, when I use the words 'ordinary care,' I mean the care that a reasonably careful pharmaceutical company would use under circumstances similar to those shown by the evidence." (Emphasis added.)

[12] With regard to this observation, the following from the case of *Hamilton* v. *Hardy, supra,* at page 383, is applicable:

"Under strict liability, the test is whether the failure of Searle [the same company as in the matter *sub judice*] to adequately warn of the potentially dangerous propensities of its product rendered that product unreasonably dangerous. It is of no import whether this drug manufacturer's warning comported with the warning a reasonably prudent drug manufacturer would have given. '[S]trict tort liability shifts the focus from the conduct of the manufacturer to the nature of the product.'" (Citations omitted.)

On strict liability pertaining to the manufacturer of dangerous drugs, the Superior Court of Texas, in *Crocker* v. *Winthrop Lab.* (Tex. 1974), 514 S.W. 2d 429, at page 432, held:

"The failure to warn of a danger cannot always be excused by the mere fact that the potentially endangered users are few in number. Furthermore, some products, though manufactured as designed and intended, are so dangerous in fact that the manufacturer should be liable for resulting harm though he did not and would not have known of the danger at the time of marketing."

The distinction between negligence and strict liability based on failure to warn is well stated in *Phillips* v. *Kimwood Machine Co.* (1974), 269 Ore. 485, 525 P. 2d 1033, at page 498:

"In a strict liability case we are talking about the condition (dangerousness) of an article which is sold without any warning, while in negligence we are talking about the reasonableness of the manufacturer's action in selling the article without a warning. The article can have a degree of dangerousness because of a lack of warning which the law of strict liability will not tolerate even though the actions of the seller were entirely reasonable in selling the article without a warning considering what he knew or should have known at the time he sold it."

By incorporating negligence concepts into the instructions to the jury on strict liability, the trial court committed clearly prejudicial and reversible error.

The trial court also erred by withdrawing from the jury the question of the adequacy of the warning about the dangerous propensities of Ovulen to the user. The record demonstrated that Searle published pamphlets in lay language intended for the user. Reasonable minds could conclude that these were, in essence, promotional pamphlets designed to sell a product.

Searle may well have had no duty to warn prospective users by direct communication, but having undertaken to do so voluntarily, Searle must inform prospective users fully in its promotional literature.[13]

Given this factual posture, the issue of adequacy of warning to the user of the dangerous propensities of Ovulen, and Angela Seley's reliance on the warning directed to her was properly a question for the jury. Withdrawal of such vital issue from the jury was prejudicial and reversible error because it went to the very heart of plaintiffs' claim for recovery.

## II.

With reference to case No. 80-360, it is my view that the Court of Appeals' affirmance of the jury verdict in favor of defendants, Francis J. Froehlich, M.D., the prescribing and treating physician, and his professional corporation, should be reversed, and the plaintiffs granted a new trial as to these defendants.

---

[13] See, e.g., *Briere* v. *Lathrop Co.* (1970), 22 Ohio St. 2d 166; *Indian Towing Co.* v. *United States* (1955), 350 U.S. 61; *Nelson* v. *Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 199 N.E. 2d 769; *Sweet* v. *Ringwelski* (1961), 362 Mich. 138, 106 N.W. 2d 742; *Albresch* v. *Northwestern Bell Tel. Co.* (1956), 246 Minn. 408, 75 N.W. 2d 206.

The informational literature, and warnings of danger by using Ovulen contained therein, given by defendant Searle to plaintiff's physician does not automatically absolve defendant Searle of liability. *Mahr* v. *G. D. Searle & Co., supra,* holds at page 561:

"[W]hile the [prescription drug] manufacturer's duty to warn is for the benefit of the ultimate consumer of its products, the physician, in the role of a learned intermediary, is the person to whom the warnings are to be communicated. * * * [H]owever, the adequacy of the communication of the warning is not judged solely by reference to the information supplied by the manufacturer to the prescribing physicians." See, also, *McEwen* v. *Ortho Pharmaceutical Corp.* (1974), 270 Ore. 375, 528 P. 2d 522; *Vaughn* v. *G. D. Searle & Co.* (1975), 272 Ore. 367, 536 P. 2d 1247.

This action was for medical malpractice based upon Dr. Froehlich's negligence in prescribing Ovulen, and his failure to obtain consent for the use of the drug from Angela Seley.

The trial court committed reversible error, prejudicial to plaintiffs, when it gave jury instructions requiring proof of each of five items before permitting plaintiffs to recover.[14] However, it was not necessary for plaintiffs to prove that Angela Seley had suffered from elevated blood pressure before the stroke. It was necessary for plaintiffs to prove that the use of the pill prescribed for her by Dr. Froehlich caused her stroke. The plaintiffs presented such evidence through their expert witnesses, thereby raising the jury question whether this conduct constituted negligence. The instruction, as formulated, placed a greater burden of proof on plaintiffs than the law requires.[15]

Accordingly, due to the erroneous jury instruction on Dr. Froehlich's negligence, the Seleys' fifth proposition of law is well taken.

The Court of Appeals found the jury instruction, even if

---

[14] Such jury instruction is set forth verbatim in the majority opinion.

[15] The correct rule of law on medical malpractice negligence on which the jury should have been instructed is as follows:

"In order to establish medical malpractice, it must be shown by a preponderance of evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence, would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and the injury complained of was the direct and proximate result of such doing or failing to do some one or more of such particular things." Paragraph one of the syllabus in *Bruni* v. *Tatsumi* (1976), 46 Ohio St. 2d 127.

Contrary to the rule of law announced by this court in *Bruni, supra,* the trial court singled out certain items of proof and gave them undue emphasis, requiring plaintiffs to prove each of such items *seriatim* before the negligence of Dr. Froehlich could be established. This is not the law as embodied in *Bruni, supra.* 53 Ohio Jurisprudence 2d, Trial Sections 174-177. It was for the jury to determine what items of evidence constituted negligence of the Dr. Froehlich within the confines of *Bruni, supra.*

The jury instruction should have been broad enough for the jury to determine that Dr. Froehlich was guilty of negligence by prescribing Ovulen for Angela Seley in the light of her past history, or that he was guilty of malpractice by failing to monitor her sufficiently after prescribing the pill. Plaintiffs presented expert testimony on both aspects or theories. It was not necessary for plaintiffs to prove Dr. Froehlich negligent in both respects. Deviation by Dr. Froehlich from the standard of care in either respect entitled plaintiffs to a verdict in their favor.

erroneous, was not prejudicial, due to the jury's finding that Dr. Froehlich did not know of Angela Seley's past history of hypertension. In reaching this unfounded conclusion, the Court of Appeals failed to consider the jury's conclusion, in response to the special interrogatory, that Angela Seley was not guilty of contributory negligence. This conflicts with another jury response to an interrogatory stating Angela Seley did not inform Dr. Froehlich of her hypertension.

Despite the fact that twice plaintiffs requested the trial court to read the instructions dealing with the theory of informed consent by Angela Seley, at the time the jury requested further instructions on the negligence of Dr. Froehlich, the trial court refused such requests. The informed consent of Angela Seley was an issue for the jury to decide. *Bruni* v. *Tatsumi* (1976), 46 Ohio St. 2d 127, at pages 136-137. See *American Steel Packing* v. *Conkle* (1912), 86 Ohio St. 117; *Belcher* v. *Carter* (1967), 13 Ohio App. 2d 113; *Berkey* v. *Anderson* (1969), 1 Cal. App. 3d 790, 82 Cal. Rptr. 67. Given these circumstances, the evident confusion of the jury on this issue demands a new trial.

DONOFRIO, J., concurs in the foregoing dissenting opinion as to case No. 80-336 only.