LAYNE *v.* GAF CORPORATION ET AL.

(No. 84-074194—Decided
April 15, 1988.)

Court of Common Pleas of
Cuyahoga County.

*Robert E. Sweeney* and *Michael V. Kelley,* for plaintiff.
*Hilary S. Taylor,* for defendant United States Mineral Products Co.

JAMES J. MCMONAGLE, J. On October 6, 1987, a $400,000 verdict was returned in favor of Geraldine Layne who had claimed that she had contracted mesothelioma during her employment as a word processor from 1973 until 1985 in the Anthony J. Celebrezze Federal Office Building in Cleveland, Ohio. The plaintiff proved to the jury's satisfaction that in-place asbestos had been released into the ambient air during numerous renova-

tions of the building. The verdict was returned against the sole remaining non-settling defendant, United States Mineral Products Company ("USM"), a company which admitted that in the late 1960s it had manufactured and marketed a product called "Cafco" which contained asbestos and was used in the Celebrezze Federal Building as insulation, fire retardant and as a noise-softening product.

Much attention has been focused on this case because of its impact upon hundreds of thousands of buildings in the United States that contain some form of in-place asbestos-containing materials. Defendants and other commentators who have been involved in this proceeding at both pre- and post-verdict stages referred to this verdict as signaling the beginning of the end of asbestos litigation because this concerns a secretary who is dying because of her work exposure in an office and the effect upon the value of asbestos-infected property. The cost of making both the workplace and the residences safe will have to be reflected in the market value of properties.

Products liability has a societal purpose of compensating people who are injured because of defective products by allocating loss to those who are most able to pay for damages and thus to encourage safer products. The products liability legal theories have only developed since our society has become economically stable and, therefore, able to address the needs of the individual. Before the economy was self-sufficient, the law permitted a greater degree of personal sacrifice to promote common economic good. Whether or not there are repercussions from the creation of a new class of plaintiffs is not a proper criterion for evaluating the defendant's motion for judgment n.o.v. and for setoff.

A listing of the defendant's bases for its motion is attached herewith as

Exhibit A.[1] Because of the fungible nature of the claimed errors, the court will not deal with these individually. This court is guided in its determination by Civ. R. 50, and the appropriate test is "whether the defendant is entitled to judgment as a matter of law when the evidence is construed most strongly in the favor of the plaintiff." *Cataland* v. *Cahill* (1984), 13 Ohio App. 3d 113, 114, 13 OBR 131, 132, 468 N.E. 2d 388, 390.

The plaintiff does not dispute that USM is entitled to a setoff for all monies received from the other settling defendants. The amounts paid by the other defendants are as follows:

| | |
|---|---|
| Asbestos Claims Facility Defendants | $50,000 |
| Raymark Industries, Inc. | 8,850 |
| Crown Cork & Seal | 800 |
| Rock Wool Manufacturing Co., Inc. | 1,200 |
| Flintkote Co. | 850 |
| | $61,700 |

USM mistakenly claims that the amount of the setoff should be the amount demanded in negotiations rather than the amount actually received by the plaintiff. R.C. 2307.32(F)(1) specifically provides that good faith settlements will reduce a claim "to the extent of any amount stipulated by the release or the covenant * * *." Defendant, therefore, will be entitled to a setoff of $61,700.

USM contends that the granting of a total of six peremptory challenges to plaintiff was prejudicial, citing *LeFort* v. *Century 21-Maitland Realty Co.* (1987), 32 Ohio St. 3d 121, 512 N.E. 2d 640. In *LeFort*, there was held to be no prejudice in the trial court granting three peremptories to each of several defendants. Herein, the plaintiff's interests regarding each defendant are different and antagonistic, so the court permitted the plaintiff an equal number of peremptories as to each defendant. To permit otherwise would permit multiple defendants to effectively control jury selection.

USM broadly states the court has misconstrued and misapplied the status of products liability law in Ohio as it relates to asbestos litigation.

USM has no standing to assert these claimed errors. Civ. R. 51(A) states in pertinent part:

"A party may not assign as error the giving or the failure to give any instruction unless he objects thereto before the jury retires to consider its verdict, stating specifically the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury."

The following colloquy took place between the court and counsel for the defendant after the court had given its complete charge to the jury:

"BY THE COURT: Before we go any further, is there anything by way of addition to, deletion from, or amendment to the charge?"

"MR. TAYLOR (attorney for

---

[1] Defendant's grounds for the instant motion may be summarized as follows:

(1) Ohio does not recognize a failure-to-warn strict liability cause of action;

(2) The duty to warn does not extend beyond the sale to a learned intermediary;

(3) The dismissal of the negligence cause should have resulted in the dismissal of this case;

(4) In Ohio there is no continuing duty to warn in strict liability;

(5) The granting of six peremptory challenges to the plaintiff was prejudicial to USM;

(6) Plaintiff's demand for $5.5 million in final argument was in violation of Civ. R. 54(C);

(7) Plaintiff's claim is barred by the statute of limitations.

USM): Nothing, your honor. Thank you very much."

The above-quoted transcript indicated the defendant was fully satisfied with the court's interpretation and recitation of the law in Ohio as it would apply to this case.

However, in order to promote consistency in further cases, a short discussion of Ohio products liability law is in order.

Ohio recognizes three different circumstances that give rise to a products liability cause of action:

1. Manufacturing defect — where the product fails and creates a hazard because it was not manufactured or did not perform as designed. *Lonzrick* v. *Republic Steel Corp.* (1966), 6 Ohio St. 2d 227, 35 O.O. 2d 404, 218 N.E. 2d 185.

2. Design defect — where a product's very design creates the hazard. *Leichtamer* v. *American Motors Corp.* (1981), 67 Ohio St. 2d 456, 21 O.O. 3d 285, 424 N.E. 2d 568.

3. Failure to warn — a variation on the concept of design defect; the product is unsafe or inherently dangerous unless accompanied by adequate warning of risks or instructions. *Seley* v. *G.D. Searle & Co.* (1981), 67 Ohio St. 2d 192, 21 O.O. 3d 121, 423 N.E. 2d 831.

Defendant claims that a failure-to-warn product liability cause of action does not exist in the state of Ohio except for prescription drug cases. Even though this issue has not been directly addressed by the Ohio Supreme Court, a broad survey of law in other jurisdictions indicates that in determining whether a duty to warn exists, courts usually consider the following factors:

1. Whether the product possesses inherently dangerous characteristics which pose a risk to the foreseeable user or a person in a zone of danger;

2. Whether the product's defects would adversely affect only a few individuals;

3. Whether the product is unavoidably unsafe; or

4. Whether the product presents a high risk of danger under certain unusual or unintended usage.

Some commentators have indicated that using criteria such as the above provides hindsight liability,[2] but as in all products liability cases, the

---

[2] Huber, Knowledge of the Law Is No Excuse (1988 Manhattan Institute for Policy Research):

"In his whimsical poem, 'The Objection to Being Stepped On,' Robert Frost recounts how he accidentally 'stepped on the toe of an unemployed hoe.' The implement instantly 'rose in offense' and struck Frost a blow 'in the seat of [his] sense.' Yes, the Bible had foretold the day when weapons would be turned into tools. 'But what do we see? The first tool I step on, Turns into a weap-on.'

"There is great insight here. The line between tools and weapons is exceedingly fine. Knives cut, irons scorch, dynamite explodes, poison kills. In the wrong hands, or under the wrong foot, the tamest and most domestic object quickly becomes an instrument of assault and battery.

"Until the 1950s, the law on these matters was fairly simple. Wherever possible, the old tort law left it up to the individual to distinguish between weapons and tools in his own private universe. If someone wanted to buy a fast horse, lightweight canoe, sharp knife, or strong medicine, that was his business and his risk, or more precisely, it was a risk that he and his seller could allocate between themselves as they chose.

"The new tort jurisprudence that developed in the 1960s was quite different. Tort law advanced; contract principles receded. A new tort system gradually stepped in to preempt and rewrite a million allocations of risk and responsibility that had once been decided by contract. The new tort system was much busier than the old. And having made product 'defects' the center of its attention, it had a very much more technocratic function."

focus is upon the performance of the product and not on the manner and circumstances under which it was manufactured.

In *Temple* v. *Wean United, Inc.* (1977), 50 Ohio St. 2d 317, 4 O.O. 3d 466, 364 N.E. 2d 267, the Ohio Supreme Court adopted Section 402A of the Restatement of the Law 2d, Torts. The *Temple* court held that in order to recover on a claim such as has been presented here, the plaintiff would have to prove the following four elements:

1. That the defendant manufactured or sold asbestos-containing products;

2. That the defendants were normally engaged in the business of selling such products;

3. That the asbestos-containing products were expected to and did reach this plaintiff without substantial change in the condition in which they were sold; and

4. That at the time of such manufacture or sale, the asbestos-containing products were in a defective condition and were unreasonably dangerous. *Id.* at paragraph one of the syllabus.

The dynamics of asbestos litigation wherein the disease process can have a gestation period from anywhere between five and forty years from the date of exposure, when coupled with the dates when the manufacturers either had actual knowledge or should have had actual knowledge of the defectiveness of their products, involve Comment *k* and Comment *j* of Section 402A.

*Seley* v. *G. D. Searle & Co., supra,* endorsed Comment *k,* which addresses products which are unavoidably unsafe because, at the present state of human knowledge, such products are incapable of being made safe for their intended use:

"*Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. * * * Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unreasonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk." (Emphasis *sic.*) 2 Restatement of the Law 2d, Torts (1965) 353-354, Section 402A, Comment *k.*

In the case of an unavoidably unsafe product, the manufacturer will not be held strictly liable for injuries resulting from use of the product if the product is properly prepared and adequate warnings as to the inherent danger of the product are given. Absent adequate warnings of the danger, the product is held to be "unreasonably dangerous," and in accordance with *Temple* v. *Wean United, Inc., supra,* liability will apply.

Liability may also apply where the seller fails to warn against unreason-

ably dangerous properties of the product of which the seller was aware or should have been aware. Comment *j* to Section 402A provides as follows:

*"Directions or warning.* In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use. The seller may reasonably assume that those with common allergies, as for example to eggs or strawberries, will be aware of them, and he is not required to warn against them. Where, however, the product contains an ingredient to which a substantial number of the population are allergic, and the ingredient is one whose danger is not generally known, or if known is one which the consumer would reasonably not expect to find in the product, the seller is required to give warning against it, if he has knowledge, or by the application of reasonable, developed human skill and foresight should have knowledge, of the presence of the ingredient and the danger. Likewise in the case of poisonous drugs, or those unduly dangerous for other reasons, warning as to use may be required.

"But a seller is not required to warn with respect to products, or ingredients in them, which are only dangerous, or potentially so, when consumed in excessive quantity, or over a long period of time, when the danger, or potentiality of danger, is generally known and recognized. Again the dangers of alcoholic beverages are an example, as are also those of foods containing such substances as saturated fats, which may over a period of time have a deleterious effect upon the human heart.

"Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably

dangerous." 2 Restatement of the Law 2d, Torts (1965) 353, Section 402A, Comment *j.*

This commingling of the appropriate Comments to Section 402A thus also permits the manufacturer to assert a state-of-the-art defense even though this exact issue has not been ruled upon by any other court in the state of Ohio. Accord *Overbee* v. *Van Waters & Rogers* (C.A.6, 1983), 706 F. 2d 768; *Moran* v. *Johns-Manville Sales Corp.* (C.A.6, 1982), 691 F. 2d 811; *Sterns* v. *Johns-Manville Sales Corp.* (Dec. 1985), N.D. Ohio No. C79-2088, unreported; *Cleveland Bd. of Edn.* v. *Armstrong World Industries* (1985), 22 Ohio Misc. 2d 18, 22 OBR 298, 476 N.E. 2d 397; *Borel* v. *Fibreboard Paper Products Corp.* (C.A.5, 1973), 493 F. 2d 1076, certiorari denied (1974), 419 U.S. 869.

In light of the above statement of law, the following charge was correctly given to the jury:

"Now in this case the plaintiff, Geraldine Layne, claims a right of recovery against the defendant U.S. Mineral Products Corporation under a principle of law known as strict product liability. Plaintiff claims that the defendant manufactured and distributed a product that was defective and unreasonably dangerous to the plaintiff, an employee in the Federal Building, located at the corner of East 9th and Lakeside from approximately the years of 1973 until 1985.

"The defendant denies that its product was defective and unreasonably dangerous, and also asserts that it had provided an adequate warning.

"Now under Ohio law there is an obligation known as strict products liability. It is imposed upon the manufacturer of a product, which is in a defective condition, unreasonably dangerous to a person who would be foreseeably exposed to that product for physical harm caused thereby to such

person if, number one, the manufacturer is engaged in the business of manufacturing such a product. And, secondly, it is expected to and does reach a person so situated without substantial change in the condition in which it is sold.

"Now this rule applies although the seller has exercised, the seller and/or manufacturer, has exercised all possible care in the preparation and sale of his product. And even though the plaintiff has not bought the product herself from the manufacturer or even has entered into any contractual relationship with the manufacturer of the product.

"Now an action in strict product liability cannot be maintained solely upon the failure of giving of an adequate warning. Now for a plaintiff to recover she must prove by a preponderance of the evidence that there was, in fact, a defect in the product manufactured by the defendant. Secondly that such defect existed at the time the product left the hands of the defendant. And thirdly that the defect was a proximate cause of the plaintiff's injury.

"The crux of a strict products liability action is that the product must perform in accordance with the expectations of the ordinary user. A product that does not measure up to such expectations is unreasonably dangerous and hence defective.

"Now a product will be found unreasonably dangerous if it is dangerous to an extent beyond the expectations of an ordinary person or a person who would be foreseeably exposed to it when it is used as intended or in a reasonably foreseeable manner. Now the rule just stated does not apply to a product that is unavoidably unsafe if an adequate warning had actually been provided.

"Now there are some products, which in the present state of human knowledge, are quite or in the present state of human knowledge when manufactured are quite incapable of being made safe for their intended use. Such a product properly prepared and accompanied by proper directions and warnings is not defective nor is it unreasonably dangerous so long as the products are properly prepared and marketed and proper warning is given where the situation calls for it.

"The seller or manufacturer will not be held to strict liability for unfortunate consequences attending their use merely because he has undertaken to supply the public with an apparently useful and desirable product intended with a known but apparent reasonable risk. Now if you find that the asbestos products were useful and desirable and yet unavoidably unsafe, then if you also find a proper warning of their hazards was given, then they would no longer be unreasonably dangerous.

"Now where a manufacturer knows of or learns that its product is in a defective condition, unreasonably dangerous, and that such danger is not obvious to a user or a person who would be foreseeably exposed to that product, such manufacturer has a duty to give an adequate and sufficient warning so that it would be communicated to a person who would be foreseeably exposed to that product.

"A warning is adequate where under all the circumstances it reasonably discloses all risks inherent in the use of the product of which the manufacturer being held to the standard of an expert in the field knew or should have known to exist.

"Now one who manufactures a product for sale in use by others is held to the skill of an expert in that business and to an expert's knowledge of the arts, materials and processes involved in the development, production and marketing of that product. The manufacturer has a duty to remain reason-

ably current with scientific knowledge, development, research and discoveries concerning its product.

"The manufacturer must communicate its superior knowledge in a manner that would sufficiently notify all individuals who would be foreseeably exposed to that product and to an individual who thusly would be, by their own limited knowledge and information, unable to protect themselves while being exposed foreseeably to the product.

"However, a manufacturer need not instruct or warn of its product unless and until the state of medical, scientific and technical research and knowledge has reached a level of development that would make a reasonably prudent manufacturer aware of the unreasonable risks of harm in the exposure to the persons who would be foreseeably exposed to that product, and aware of the necessity to instruct or warn those individuals against such risks of harm.

"Now a party seeking recovery must not prove — must not prove only a violation of this strict liability law, which I have outlined for you, but also must show that this violation or this wrongful act was a proximate cause of injury.

"Now 'proximate cause' is defined as an act or omission which directly causes or directly fails to prevent an injury.

"Now the causal connection between a defendant's violation of strict products liability and the plaintiff's injury may be broken by intervening cause. In order to break the chain of causation the intervening cause must be one not brought into operation by the original wrongful act, but operating entirely independent thereof. And it must be such a cause as would have produced the result without the operation of the original wrong. The intervening cause must be one that is not reasonably foreseeable by a defendant.

"Now it is not necessary that the proximate cause be the immediate cause in point of time, but it should be nearest in causal connection. And [it] may be defined as that which in a natural and continuous sequence of events produced a result without which it would not have happened.

"Now if you find that the plaintiff has sustained that burden of a violation of the products liability law, and furthermore that the damages caused were proximately caused by it, then you should then go on to a consideration of damages. The damages that Mrs. Layne would be entitled to if you find that plaintiff has sustained [her] burden are what we would call compensatory damages."

USM has asserted that since it had warned the building owner and/or contractor of the potential hazards of asbestos, the "learned intermediary" rule will absolve it from liability. In this regard, the court instructed the jury on an intervening cause, thereby permitting USM to assert a defense that is not normally existent in these types of cases.

The "learned intermediary" rule has only been affirmed in prescription drug cases. No one can seriously say that owners of buildings are in the same relationship to manufacturers of asbestos-containing products as are doctors to manufacturers of prescription drugs. Because of the complexity and interrelationship of various drugs, the adjective "learned" is a dynamic part of this type of a defense. The societal reasons for protecting prescription drug manufacturers from liability under product liability laws should be obvious. The defendant's reliance on *White* v. *Wyeth Laboratories, Inc.* (July 30, 1987), Cuyahoga

App. Nos. 52108 and 52564, unreported, is misplaced.[3]

Defendant's last complaints regarding the argument of counsel as being prejudicial cannot be affirmed in light of the conservative jury verdict in the amount of damages incurred by the plaintiff.

Defendant's motion for judgment n.o.v. is denied. Judgment for plaintiff reduced to $338,300.

*Judgment accordingly.*

---

[3] Reporter's Note: The court of appeals' opinion was affirmed in (1988), 40 Ohio St. 3d 390, 533 N.E. 2d 748.