OPINION
{¶ 1} This matter is before the Court on the Notice of Appeal of Sheila McBride, filed October 5, 2005. On February 24, 2004, McBride filed a Complaint for Personal Injuries, seeking damages allegedly arising from a March 19, 2002 car accident in Kettering, Ohio. The matter was referred to arbitration on September 28, 2004, and on March 28, 2005, the arbitrator awarded McBride $10,000.00. On March 31, 2005, McBride appealed the award and requested that the matter proceed to a trial by jury. A trial was held on August 8-10, 2005, and a defense verdict and judgment for Appellee Kristin H. Quebe resulted. Quebe's negligence in causing the accident was not contested. On August 19, 2005, McBride filed a Motion for a New Trial on the ground that the verdict was against the manifest weight of the evidence. The trial court overruled McBride's Motion on September 14, 2005, determining that "the jury reviewed the credibility of the witnesses in this case and reached a reasonable conclusion."
 {¶ 2} McBride asserts six assignments of error. We will address McBride's first and sixth assignments of error together, as they are both based on a manifest weight of the evidence argument. They are as follows:
"THE JURY VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE"
and
"THE TRIAL COURT ERRED IN DENYING PLAINTIFF'S MOTION FOR A NEW TRIAL"
 {¶ 3} "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. Morris Co. v. Foley ConstructionCo. (1978), 54 Ohio St.2d 279, syllabus,376 N.E.2d 578. A judgment is not against the manifest weight of the evidence unless "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Bede v. The Dayton Power Light Co., Montgomery App. No. 18705, 2002-Ohio-2378. In determining whether a judgment is against the manifest weight of the evidence, there is "a presumption that the findings of the trier-of-fact were indeed correct." Seasons Coal Co. v. City ofCleveland (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273.
 {¶ 4} "Civ. R. 59(A)(6) authorizes the trial court to vacate a judgment and order a new trial on a finding that the verdict on which the judgment was entered `is not sustained by the weight of the evidence.' When that claim is made, the court must review the evidence and pass in a limited way on the credibility of the witnesses. (Internal citations omitted). It must appear to the court that a manifest injustice has been done and that the verdict is against the manifest weight of the evidence. Rohde v.Farmer (1970), 23 Ohio St.3d 82. For example, where it appears probable that a verdict is based on false testimony, a motion for a new trial should be granted. (Internal citations omitted). A verdict is not against the manifest weight of the evidence merely because the judge would have decided the case differently. (Internal citations omitted). If the jury's verdict is supported as to each element of the plaintiff's case by some competent and apparently credible evidence, a defendant's motion for new trial should not be granted. (Internal citations omitted). Conversely, if evidence the defendant offered to rebut one or more of those elements of the plaintiff's case is competent and apparently credible, a plaintiff's motion should not be granted. Whether to grant or deny a Civ. R. 59(A)(6) motion rests with the trial court's sound discretion, and the decision cannot be reversed by a reviewing court without finding an abuse of discretion by the trial court. (Internal citations omitted). `Abuse of discretion has been defined as an attitude that is unreasonable, arbitrary, or unconscionable.' (Internal citations omitted). `A decision is unreasonable if there is no sound reasoning process that would support that decision.'" (Internal citations omitted). Bedard v.Gardner, Montgomery App. No. 20430, 2005-Ohio-4196.
 {¶ 5} "[T]he jury is not required to give any additional weight to the opinion of an expert, if any weight at all. Rather, an expert's opinion is admissible, as is any other testimony, to aid the trier of fact in arriving at a correct determination of the issues being litigated. Expert testimony is permitted to supplement the decision-making process of the fact finder not to supplant it." Sawyer v. Duncan (Dec. 14, 2000), Cuyahoga App. No. 78056.
 {¶ 6} At trial, McBride, Quebe, and Mary Ann DeVelvis, a friend of McBride's, testified. Bradford J. Murphy, D.O., McBride's family physician since April, 1991, provided expert testimony in a videotaped deposition that was shown to the jury. The defense did not present any medical testimony but relied on cross-examination of Murphy. McBride's medical records, including those that pre-dated the accident, were admitted into evidence.
 {¶ 7} At the time of the accident, McBride, who was driving a Chevrolet Silvarado pickup truck, was stopped behind several cars at a traffic light, heading east at the intersection of Stroop Road and Far Hills Avenue, and Quebe, who was driving a compact car, failed to stop and rear-ended McBride. Quebe testified that she was traveling at a speed of approximately 30 miles an hour, and that, after slamming on her brakes, she collided with McBride's vehicle at a speed of 20-25 miles per hour. McBride's vehicle sustained minor damage only to its trailer hitch, and Quebe's vehicle sustained moderate damage to its front end. Paramedics responded to the scene. McBride was placed on a board and transported to the hospital, where she was x-rayed after complaining of pain to her neck and head.
 {¶ 8} McBride testified that, "From the impact, my head went forward and came and it slammed back on the back of my seat." The relevant emergency room records revealed a "normal appearing cervical spine without signs of subluxation or fracture." The records also indicated that there "may be some minimal straightening of the upper portion of the cervical spine which may be due to technique or patient positioning or perhaps even muscular spasm."
 {¶ 9} At the hospital, McBride was instructed to follow-up with her family physician in three days. McBride testified that she "saw [Murphy] three days after the accident and I was — my neck hurt really bad. I still was — I couldn't do anything. All I did was lay down at home. I wasn't able to work and I was in a lot of pain."
 {¶ 10} On cross-examination, McBride testified regarding certain of her earlier interrogatory responses. One interrogatory was directed toward the injuries she sustained in the accident, and McBride responded as follows: "my neck was injured in the accident, I have experienced severe neck pain since the accident. I've had physical therapy for two years. Because of my injuries I have severe migraine headaches that no medications help with." McBride also testified, however, that she had a lengthy history of migraine headaches, having been diagnosed with migraine cephalgia by Murphy in 1991. McBride also testified that her mother suffered from migraine headaches.
 {¶ 11} While McBride could only remember "one time" that she sought treatment for neck pain before the accident, Murphy's records indicated that he diagnosed McBride with cervical, thoracic, lumbar sprain 19 times between 1997 and the accident, and she received manipulative therapy to the cervical, thoracic and lumbar regions numerous times.
 {¶ 12} Murphy diagnosed McBride, in fact, with CTL strain on January 10, 12, and 17, 2002, just two months before her accident. At one point in her testimony McBride did acknowledge occasional neck pain before the accident, but then she later stated, "My neck did not hurt before I was in the car accident."
 {¶ 13} In response to an interrogatory regarding other incidents, falls or accidents that she experienced before the accident, McBride only listed a work-related injury from 1992 that involved a pulled muscle in her back. Subsequent testimony, however, revealed that McBride had experienced multiple head injuries in the past, some of which resulted in loss of consciousness.
 {¶ 14} Murphy testified that when he saw McBride in his office, she "stated that she — since the time of the accident that she had been having some neck problems and her neck was hurting and that she was getting migraines or headaches." Murphy diagnosed acute cervical strain and CTL strain on March 23, 2003, and he diagnosed cervical thoracic strain and a deceleration injury on March 28, 2002, also noting "restricted rotation to right" in McBride's records. Murphy admitted that complaints of pain and stiffness are subjective in nature.
 {¶ 15} When asked about the finding in the emergency room records of straightening in the cervical spine, Murphy explained, "[u]sually that's an indication that there's been some recent trauma to the neck and that because of muscle spasm that initially a lot of the muscle spasm is anteriorly, it will cause a pulling effect and so that the neck actually will straighten out."
 {¶ 16} Murphy referred McBride to a physical therapist. Murphy later ordered a CAT scan when McBride continued to complain of pain, and he testified that the results "did not show any disk ruptures, nothing surgical." Ten months after the accident, Murphy referred McBride to a neurosurgeon, who ordered an MRI. Murphy testified regarding the MRI results as follows: "The significance it shows is at C5 — at a level of the disk, C5-C6, it shows that there is some disk disease which is causing some flattening of the spinal cord and that there is some mild foraminal stenosis which is where the opening is for the nerve to come out and these would be nerves that go down the arms, and that it also showed that there were similar changes at other levels, but at C5 and 6 there was actually some mild cord involvement."
 {¶ 17} Murphy testified that he then referred McBride to a physiatrist, which is "a physician trained in physical medicine and rehabilitation medicine, deals with musculoskeletal type injuries." The physiatrist recommended a home exercise program at Kettering Hospital.
 {¶ 18} Murphy opined that all of the above treatments were reasonable and necessary as a direct result of the car accident. He testified within a reasonable degree of medical probability that, as a result of the accident, McBride "suffered a deceleration type injury which resulted in a musculoskeletal/myofascial type of injury involving the muscles, ligaments that support the spinal column, and that the resulting muscle spasm and headaches were all caused by this." Murphy's records, however, revealed a diagnosis of chronic cephalgia on November 14, 2000, three months before the accident.
 {¶ 19} On cross-examination, Murphy stated that he had not seen the police report regarding the accident or photos of McBride's vehicle. He stated that he was not aware that McBride "had only about three hundred dollars in damages to the car she was in." He was also unaware that McBride was in a pickup type of vehicle.
 {¶ 20} Murphy testified regarding his diagnosis of McBride with CTL strain two months before the accident, at which time he performed osteopathic manipulative therapy, which involved manipulation of the spine from the neck down to the low back. Regarding his practice of making a general diagnosis of CTL strain, the following exchange occurred:
 {¶ 21} "Q. * * * Can we assume, Doctor, that whenever your notes indicate CTL, it means the same thing throughout?
 {¶ 22} * * *
 {¶ 23} "Q. Stands for cervical/thoracic/lumbar?
 {¶ 24} "A. It means there's a spinal problem.
 {¶ 25} * * *
 {¶ 26} "A. Is as far as I would assume.
 {¶ 27} "Q. * * * Now, some days her chief complaint may be one area versus another, but your diagnosis will be CTL perhaps?
 {¶ 28} "A. Well, normally, if someone comes in even with a lumbar problem, part of our — the way we treat that is we treat the entire spine.
 {¶ 29} * * *
 {¶ 30} "A. And so there — they may come in with a low back problem but we will treat the cervical spine, the thoracic spine along with that."
 {¶ 31} Murphy's records revealed, in contradiction to his testimony, that his spinal diagnoses were often specific rather than general to the entire spine. On March 18, 1992, Murphy diagnosed McBride with "acute thoracic lumbar strain," and on April 23, 1999, when McBride came to his office complaining of "real bad pain in back of neck," he diagnosed "acute cervical strain," as opposed to CTL strain.
 {¶ 32} When Murphy first began seeing McBride in 1991, he referred McBride to a neurologist due to migraine headaches, and on April 29, 1991, in a letter to Murphy, the neurologist noted "evidence of somatic dysfunction in the cervical region, particularly on the left side." Murphy testified that somatic dysfunction "would mean that there is a — some type of soft tissue problem and maybe muscle spasm, maybe some muscle tightness, could be restriction in mobility. * * *" On May 21, 1991, the neurosurgeon noted that "rather marked tenderness is noted at the atlanto-occipital junction on the right side." Murphy testified that the atlanto-occipital junction is "the articulation or the junction of the first cervical vertebra with the skull."
 {¶ 33} Following her work-related injury in 1993, Murphy referred McBride to Professional Therapeutic Services, Inc. for therapy after diagnosing acute thoracic lumbar strain (and not CTL strain). The therapist noted that McBride complained of pain "throughout the cervical and thoracic area." The therapist also noted that McBride experienced a decrease in range of motion for right rotation of the cervical spine, similar to Murphy's diagnosis after the accident, on March 28, 2002. Murphy's records again noted neck pain on October 25, 1993, for which he prescribed Darvocet.
 {¶ 34} In her brief, McBride argues that "the uncontested evidence demonstrated that McBride should have minimally been compensated for her emergency room expenses and her medical care immediately following the collision. As the jury's verdict did not do this, it was against the manifest weight of the evidence" and should be reversed and a new trial ordered.
 {¶ 35} McBride relies on two cases from this court. InMinney v. Guthrie (Jan. 12, 1989), Greene App. No. 88-CA-37, the only issue before the trial court was whether defendant proximately caused plaintiff's neck, lower back and shoulder injuries when he rear-ended a van in which plaintiff was a passenger. At trial, plaintiff admitted that she had sustained neck injuries in a prior car accident, and that she experienced neck problems due to domestic violence prior to the accident at issue. Id. The judgment of the trial court granting a new trial following a defense verdict was affirmed because the record contained "two uncontradicted expert opinions that [plaintiff]sustained a flexion-extension type neck injury caused by theApril 20, 1984 collision." Id. (Emphasis added). Defendant's expert testified that plaintiff did not suffer any other injury to any other part of her body as a result of the accident, while plaintiff's expert testified that plaintiff's treatment for lower back and shoulder pain were directly related to the collision, thus placing the amount of reasonable and necessary medical expenses at issue. Both experts opined that it was reasonable for plaintiff to have sought emergency room care following the collision. The court determined that, "[a]t a minimum, the manifest weight of the evidence supports an award of damages for Minney's emergency room care immediately following the collision."
 {¶ 36} In Walker v. Holland (Jan. 24, 1997), Montgomery App. No. 15765, a defense verdict was held to be against the manifest weight of the evidence where the jury determined that defendant did not cause the pregnant plaintiff's miscarriage or any physical injuries, but where "it cannot be disputed that [defendant's] negligence caused [plaintiff] to undergo an emergency room examination and an ultrasound test. In light of [plaintiff's] pregnancy and the substantial damage to her vehicle in the head-on accident, * * * she received appropriate medical treatment. Common sense would dictate, at a minimum, that a pregnant woman should undergo such testing." Defendant argued "`expenses for diagnostic tests are not recoverable in the absence of causation and injury'" (internal citations omitted), and that plaintiff was required to "establish a causal connection between the defendant's negligence and the expenses, and expert testimony was required to establish the necessity of the treatment which resulted in the billings."
 {¶ 37} In Walker, we noted that, "`simply because plaintiff's expert testified that the billings were necessitated by the accident, they are not automatically entitled to prevail on the question of necessity, even where their expert's testimony on that point is not directly controverted by defendant's evidence, so long as there appear in the record objectivelydiscernible reasons upon which the jury could rely to reject theexpert's opinion testimony.'" (emphasis added) (Citing Muncy v.Jones (Jan. 19, 1984), Franklin App. No. 83AP.) The court further noted that a causal connection between defendant's negligence and plaintiff's expenses was clear. Id. Plaintiff presented expert testimony regarding the propriety of her treatment, and that testimony was not contradicted by defendant's expert witness. Id. In other words, in the absence of "objectively discernible reasons" to which the jury could cite to deny damages for the medical bills, Plaintiff was entitled to compensation for the expenses.
 {¶ 38} In response to McBride's brief, Quebe argues that "in various cases, the jury's decision to deny recovery, even for emergency room or initial medical treatment, has been upheld."Prior v. Tooson,Clark App. No. 2002-CA-91, 2003-Ohio-2402. InPrior, the trial court abused its discretion in failing to grant plaintiff's motion for a new trial where defendant admitted negligence and did not discount the objective findings of the MRI scan taken of plaintiff two months after defendant caused the rear-end accident. Plaintiff's expert testified that "the auto accident aggravated [plaintiff's] pre-existing bulging disk and caused a herniated disc, and he believed that plaintiff's headaches were related to the arthritis in the neck and the disc formation." Id.
 {¶ 39} At trial, plaintiff's testimony wholly lacked credibility. He denied statements about his medical history that were attributed to him in his records. He claimed to have had no type of bodily discomfort before the accident, and that his health was good, but his medical history before the accident "included colon cancer, removal of the colon, and placement of an ileostomy; esophageal dilation for gastroesophageal reflux disease, upper and lower endoscopies, inguinal hernia repair, appendectomy, trouble with nerves and anxiety; migraine headaches, chronic allergies, and a skull fracture." Id.
 {¶ 40} In reversing and remanding the matter for further proceedings, the court stressed that it did so "relunctantly, due to the significant credibility issues that exist." Id. The court noted that "we cannot completely discount the objective finding in the February 1999 MRI of a left lateral herniated disc at C6-7. The herniated disc may have resulted from pre-existing injuries, or from pre-existing degenerative disease, or from the 1998 accident. It may also have been caused by a combination of one or more of these factors. Pryor presented evidence indicating that the herniated disc was caused by the accident, and the defense cross-examination and evidence did not clearly discount this theory." Id.
 {¶ 41} It was significant in Pryor that "even though defense counsel successfully cast doubt on Pryor's credibility and the extent of his injuries, the evidence about other causes for the disc problem could have been more clear. In this regard, [the court noted] that medical records concerning Pryor's previous accidents or medical problems would have been very helpful in sorting out what injuries, if any, were proximately caused by the 1998 accident." Id. See McCall v. Mareino,138 Ohio App.3d 794, 742 N.E. 2d 668 (affirming denial of plaintiff's motion for judgment notwithstanding the verdict or new trial where "[t]here was competent evidence indicating a very minor collision upon which the jury could conclude that the claimed injuries, which did not immediately manifest themselves, were either wholly manufactured, grossly overstated or not proximately caused by the collision. There was no medical evidence relating to objective findings that documented injury to the plaintiffs as a result of the collision. The only evidence that pointed to any physical injury, apart from the subjective protestations of pain, was physical test results indicating a slight limitation of movement for McCall and Ellis in the form of a positive result to straight-leg raising * * * and a limitation of range of motion in Ellis' lower back movement. These movement limitations, alone, are not conclusive evidence of injury because (1) there was absolutely no evidence of neurological or orthopedic damage or other objective findings of injury, and (2) motion tests themselves are not objective tests, but are entirely premised on subjective findings elicited from responses controlled by the patient. The jury was free to assess the credibility of witnesses and believe or disbelieve the evidence, in whole or in part.")
 {¶ 42} We agree with the trial court that the jury's verdict was not against the manifest weight of the evidence, and the trial court did not abuse its discretion in overruling McBride's Motion for a New Trial. The Minney court considereduncontradicted expert testimony, from both the plaintiff and the defendant, as to the diagnosis and causation of plaintiff's flexion-extension neck injury, and as to the reasonableness of her trip to the emergency room and subsequent therapy. Murphy's expert opinion that the accident herein proximately caused McBride's muscle spasm and headaches was not only refuted by but clearly inconsistent with Murphy's own medical records showing years of treatment for migraine cephalgia, neck and back pain. The jury was free to give no weight to Murphy's expert medical opinion on the element of causation.
 {¶ 43} The matter herein is similarly distinguishable fromWalker. McBride was not pregnant at the time of the accident and accordingly not compelled by "common sense" to seek emergency treatment under the facts herein; her vehicle did not sustain substantial damage in a head-on collision. As noted, McBride received numerous diagnoses of CTL strain over the years, McBride received treatment, three months before the accident, for "chronic cephalgia," and two months before the accident, for CTL strain. There were no objective findings of injury in the emergency room records, only subjective complaints of pain. Accordingly, simply because Murphy opined that the billings were necessary, the jury was free to reject his opinion based on the objectively discernible reasons or explanations for McBride's complaints that Murphy's records revealed. The jury did not lose its way in determining that there was no causal connection between Quebe's negligence and McBride's expenses.
 {¶ 44} Finally, in terms of credibility, McBride's testimony herein is similar to the plaintiff's inconceivable testimony inPrior. Again, while McBride testified that her neck pain and migraines resulted from the accident, her medical records predating the accident, records absent in Prior, contradicted her testimony and were undoubtedly helpful to the jury in determining what injury, if any, was proximately caused by the accident. In view of McBride's records, the jury was free to conclude that the injuries McBride claimed were "either wholly manufactured, grossly overstated or not proximately caused by the collision." McCall.
 {¶ 45} Having reviewed the entire record, presuming that the findings of fact of the jury were indeed correct, having weighed the evidence and all reasonable inferences, and having considered the credibility of the witnesses, we cannot say that the jury lost its way in resolving conflicts in the evidence such that a manifest miscarriage of justice occurred requiring the order of a new trial. Further, having determined that the jury's verdict is supported by some competent and credible evidence, we conclude that the trial court did not abuse its discretion in overruling McBride's Motion for a New Trial. Accordingly, McBride's first and sixth assignments of error are overruled.
 {¶ 46} McBride's second assignment of error is as follows:
"THE TRIAL COURT ERRED IN GIVING AN IMPROPER JURY INSTRUCTION."
 {¶ 47} The instruction to which McBride specifically objects is as follows: "* * * if you find that the plaintiff failed to prove that the defendant's negligence proximately caused injury to the plaintiff, then your verdict must be for the defendant." According to McBride, "[e]ven if the trier of fact were to have concluded that McBride's neck injury was not as a result of the automobile collision, Defendant/Appellee should have still had to compensate McBride for the medical expenses incurred by McBride's visit to the hospital immediately after the accident to be examined."
 {¶ 48} "On appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, statingspecifically the matter objected to and the grounds of theobjection." Civ. R. 51(A) (emphasis added). "Failure to object at trial waives all but plain error, which is used only in `exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." Kennedy v. Streibel, D.O., Montgomery App. No. 19777,2003-Ohio-7241.
 {¶ 49} After the court instructed the jury, it inquired of McBride's counsel, "Are there any additions, corrections or deletions to the jury instructions as read?" Counsel replied, "None other than what we talked about earlier and we can reincorporate in our discussion now to protect the record." There was no discussion in the record regarding the court's jury instructions, and accordingly, McBride waived all but plain error herein.
 {¶ 50} "`The jury instructions given by a trial court must be a correct, clear, and complete statement of the law applicable to the case." Roberts v. State Farm Mut. Auto. Ins. Co. (2003), 155 Ohio App. 3d 535, 543-44, 802 N.E.2d 157. "It is rudimentary that in order to establish actionable negligence, one must show the existence of a duty, a breach of the duty, and an injury resulting proximately therefrom." Menifee v. Ohio WeldingProducts, Inc. (1984), 15 Ohio St.3d 75, 77, 472 N.E.2d 707. "A single instruction to a jury may not be judged in artificial isolation but must be viewed in the context of the overall charge." State v. Price (1979), 60 Ohio St.2d 136, syllabus 4,398 N.E.2d 772.
 {¶ 51} The trial court instructed the jury that Quebe admitted that her negligence caused the collision, and then continued as follows: "The questions that remain for you to decide are whether that negligence was a proximate cause of the plaintiff's injuries and what, if any damages resulted from that.
 {¶ 52} "A party who seeks to recover for injury or damage must prove not only that the other party was negligent, but also that such negligence was a proximate cause of the injury or damage.
 {¶ 53} "Proximate cause exists when an act or failure to act in a natural and continuous sequence directly produces the injury without which it would not have occurred. Proximate cause occurs when the injury is a natural and foreseeable result of the act or failure to act.
 {¶ 54} "If you find the defendant's negligence proximately caused injury to the plaintiff, then your verdict must be for the plaintiff. However, if you find that the plaintiff failed to prove that the defendant's negligence proximately caused injury to the plaintiff, then your verdict must be for the defendant."
 {¶ 55} McBride asserts a cause of action against Quebe in negligence, and the trial court's instruction was a correct statement of Ohio negligence law. McBride is not entitled to any damages if she cannot prove that Quebe's negligence proximately caused her injury; the law of negligence in Ohio does not encompass a rule whereby, in the absence of proximate cause and injury (as here), an allegedly injured plaintiff is entitled to compensation for her emergency room treatment immediately after the accident.
 {¶ 56} There being no plain error, McBride's second assignment of error is overruled.
 {¶ 57} McBride's third assignment of error is as follows:
"THE TRIAL COURT ERRED IN OVERRULING PLAINTIFF'S OBJECTIONS AT TRIAL."
 {¶ 58} McBride first objects to defense counsel's explanation of the term "occipital notch" in the following question during which counsel for Quebe read from McBride's medical records:
 {¶ 59} "Q. A month later, the occipital notch is still tender despite the nerve block. Occipital notch, again that area right where the first cervical vertebrae meets the skull * * *."
 {¶ 60} Counsel for McBride objected that defense counsel's description of the location of the occipital notch was inaccurate and properly within the province of expert testimony. A side bar was held, and the court directed defense counsel, "if you know where the occipital notch is, * * * and it's referenced in those records, you can refer to it."
 {¶ 61} Defense counsel resumed questioning McBride without mention of the location of the occipital notch, effectively rendering plaintiff's counsel's objection moot. We also note that, in contrast to McBride's assertion in her brief that "no expert testimony was ever presented to support [defense counsel's] explanation", Murphy later agreed that the occipital area is located near the top of the cervical spine towards the back of the head.
 {¶ 62} McBride next alleges that "defense counsel stated that a diagram made by McBride's family doctor prior to the accident represented pain to the head, neck and back areas."
 {¶ 63} Quebe's attorney placed the medical record on an overhead for the jury to view and referred to the diagram therein as follows: "* * * January 17 is the last time [Murphy] actually saw you before the accident and the chief complaint he says is back pain. And he drew a diagram, which I will represent to you that he says involves the neck — this is the head, neck, all the way down to the low back ____."
 {¶ 64} McBride's counsel objected that, "you can use a record to refresh somebody's recollection but you can't do that by demonstrating the exhibit to the jury and essentially providing the exhibit as substantive evidence. You hand it to the witness and say does this — you ask her the question, first, did you have neck pain and she says no or I don't remember. Then you refresh her recollection. This entire display is inappropriate * * *."
 {¶ 65} The trial court ruled that, because all of McBride's medical records were going into evidence, "showing them to the jury now on the overhead and using it as an audio visual to refresh your client's recollection or to challenge her, cross-examine her on her testimony, vis-a-vis her doctor's records are totally appropriate," but that "you are not to use what the doctors say * * * if in fact there is a question."
 {¶ 66} Following the sidebar, Quebe's counsel did not again mention the diagram from the January 17, 2002 record or how Murphy described it. We note that, in his deposition, Murphy's description of his January 17, 2002 drawing of McBride's spine is consistent with defense counsel's representation thereof when questioning McBride:
 {¶ 67} "* * * My drawing on the side there refers that it looks like her primary complaint was in the upper thoracic spine of the right-hand side.
 {¶ 68} "Q. * * * But the drawing, that refers — you're drawing the spine, is that what you're drawing?
 {¶ 69} "A. Correct.
 {¶ 70} "Q. Okay. And that would be — the circle would be the head/neck area?
 {¶ 71} "A. Right.
 {¶ 72} "Q. And on down to the low back?
 {¶ 73} "A. Right."
 {¶ 74} McBride's third assignment of error lacks merit. Following each objection and side bar, counsel for Quebe resumed cross-examination with a different question, effectively withdrawing the questions to which McBride objected. Later, Murphy's deposition revealed that Quebe accurately represented Murphy's testimony regarding the location of the occipital notch and his diagram of McBride's spine. There being no prejudice to McBride, McBride's third assignment of error is overruled.
 {¶ 75} McBride's fourth assignment of error is as follows:
"DEFENSE COUNSEL'S CLOSING ARGUMENT VIOLATED PLAINTIFF'S RIGHT TO A FAIR TRIAL."
 {¶ 76} According to McBride, defense counsel's closing argument violated McBride's right to a fair trial for the following reasons: (1) he "called on the parties [sic] passion and prejudice when he urged the jury to make a decision with which they would be `comfortable — the right decision'"; (2) he implied that McBride's claims were "motivated purely by litigation and to achieve a secondary gain"; (3) he alleged that McBride was "lying, manipulating the system and out for financial reward, even that McBride's family doctor was lying or committing malpractice."
 {¶ 77} "It is axiomatic that great latitude is afforded counsel in the presentation of closing argument to the jury. (Internal citations omitted). Included within the bounds of permissible argument are references to the uncontradicted nature of the evidence presented by the advocate. (Internal citations omitted). The assessment of whether these bounds have been exceeded is, in the first instance, a discretionary function to be performed by the trial court. (Internal citations omitted). Such determination will not be reversed on appeal absent an abuse of discretion." (Internal citations omitted). Pang v. Minch
(1990), 53 Ohio St.3d 186, 194,559 N.E.2d 1313.
 {¶ 78} "[W]e are guided by the principle that `if there is room for doubt, whether the verdict was rendered upon the evidence, or may have been influenced by improper remarks of counsel, that doubt should be resolved in favor of the defeated party.'" Pesek v. Univ. Neurologists Assn., Inc. (2000),87 Ohio St.3d 495, 502, 721 N.E.2d 1011. "`Before a reviewing court will disturb the exercise of the trial court's discretion, the record must clearly demonstrate highly improper argument by counsel which tends to inflame the jury." Id.
 {¶ 79} An appellate court shall reverse the trial court's judgment "[o]nly if circumstances are of such reprehensible and heinous nature as to constitute prejudice." Sinea v. Denman TireCorp. (1999), 135 Ohio App. 3d 44, 63, 732 N.E.2d 1033. "`When argument spills into disparagement not based on any evidence, it is improper." Pollard v. Hunt (2005), 164 Ohio App.3d 353,842 N.E.2d 547. "Although counsel may not make unwarranted attacks on a witness's character, it is not improper to characterize a witness as a liar or a claim as a lie if the evidence reasonably supports the characterization." Id. "But inferences drawn from the evidence in the cases are a legitimate subject of argument."Jackson v. Booth Memorial Hospital (1988), 47 Ohio App.3d 176,180, 547 N.E.2d 1203.
 {¶ 80} "Ordinarily, in order to support a reversal of a judgment on the ground of misconduct of counsel in his * * * closing argument to the jury, it is necessary that a proper and timely objection be made to the claimed improper remark so that the court may take proper action thereon." Snyder v. Stanford
(1968), 15 Ohio St.2d 31, syllabus, 238 N.E.2d 563. If a party fails to make proper and timely objections, the party is "precluded from relying on the alleged misconduct of opposing counsel as a basis for reversal of the judgment." Id. at 35.
 {¶ 81} The trial court "is not required to intervene sua sponte to admonish counsel and take curative action to nullify the prejudicial effect of counsel's conduct" unless an attorney "in his closing argument to the jury grossly and persistently abuses his privilege." Id. at syllabus.
 {¶ 82} We note that counsel for McBride failed to object to the testimony he cites herein. Our review of the record reveals no persistent abuse by defense counsel to warrant sua sponte admonishment of defense counsel by the court.
 {¶ 83} The arguments to which McBride objects are divided into three sections as follows:
 {¶ 84} "Ladies and gentlemen, after two and a half long days, you get all the objective evidence. You get to piece together that evidence and you get to make a decision. And I know that when you leave here today, you want to be comfortable with that decision. You want to know you did the right thing and that's what we're here for. * * *
 {¶ 85} "We think you'll agree with us that this accident did not cause a new injury. This accident caused at most a temporary flare-up in pre-existing problems. The expenses incurred after that were motivated by litigation, the desire to seek compensation. * * *
 {¶ 86} "Think about this. If you — to rule in their favor, you have to throw out physics, the laws of physics, you have to throw out years of previous complaints, you have to assume the expert that they gave you knows a lot more than he really does. And you have to assume he committed malpractice. Why?
 {¶ 87} "He treated an area that she didn't have complaint of pain of. How can a doctor manipulate a spine if she's not complaining of pain there. And the testimony and they have to acknowledge it and maybe that's why he wasn't asked about it, is he diagnosed cervical, thoracic and lumbar strain, nineteen times between 1997 and our accident. * * *
 {¶ 88} "At the same time she treating with [a physical therapist], she goes to Relax LA Style, a professional masseuse to get a massage and they talk about the tight scapular and trapezius muscles.
 {¶ 89} "You'll see that and you'll see that in [the physical therapist's records]. You'll see upper thoracic region. That was her — even Murphy admits the primary problem. I mean, she's getting physical therapy after this accident, ladies and gentlemen, that she would have probably gotten anyway unless there wasn't anyone else she could pin the responsibility on.
 {¶ 90} "The objective facts are this. She has widespread chronic problems before this accident. She was in an accident that was a modest impact. And she went to a hospital where you wouldn't expect someone to be taken — when you wouldn't expect someone to be taken to the hospital from an ambulance. * * *
 {¶ 91} "Well, ladies and gentlemen, you're going to have all the medical records before and after. You're going to have the photographs before and after and you are going to determine proximate cause and whether these medical expenses were a direct and proximate cause of this accident and should wholly be held responsible for nine thousand dollars in medical expenses. Medical expenses that more likely than not would have been incurred anyway except for that fact that we have a little motive of secondary gain.
 {¶ 92} "You will decide what medical expenses were directly and proximately related. You can decide, no, wait a minute. We can't give her an injury here. We can't give her any expenses. We don't think the accident was a direct and proximate result of any of them. We think there was a motive there."
 {¶ 93} As discussed above, there was substantial evidence from which Quebe could argue that McBride and Murphy were not credible and had in fact mislead the jury about the proximate cause of McBride's alleged injuries. A reasonable inference therefrom is a motive of secondary gain. Given the evidence, it was also reasonable to infer that McBride suffered from a pre-existing condition. McBride's testimony that she did not have neck pain prior to the accident, and that her headaches resulted from the accident, was contradicted by her own medical records. In our judgment, calling upon the jury to make "the right decision" did not inflame the jury, was well within the great latitude afforded counsel in closing argument and did not constitute prejudice to McBride.
 {¶ 94} McBride also argues that defense counsel misstated the law when he argued that McBride had to prove that Quebe injured her in the collision. Pursuant to our analysis under McBride's second assignment of error, this is untrue.
 {¶ 95} Finally, McBride objects to the following argument:
 {¶ 96} "And so what we do — and this is incredible. [Murphy] says, well, there are no objective findings at the emergency room, so it must not have been a long-term problem. That's not the way the spine works. The spine adjusts.
 {¶ 97} "You'll see swelling initially, but you won't see it if it's a chronic problem because the spine adjusts. The reason she has no swelling in the emergency room is because she has no injury, no acute injury that's causing swelling at the time.
 {¶ 98} "It's not that she doesn't have a long-term problem. They take x-rays at the emergency room and they indicate no soft tissue swelling is seen. No paravertebral soft tissue swelling is seen. This is right after the accident. No evidence of injury, normal appearing cervical spine."
 {¶ 99} According to McBride, "defense counsel presented no evidence on swelling in the spine and when it would or would not be present. * * * Therefore, Defense counsel was attempting to present evidence in his closing argument, which goes beyond commenting on the evidence presented."
 {¶ 100} The record belies McBride's argument. The following exchange occurred between defense counsel and Murphy:
 {¶ 101} "Q. Well what type of objective findings are there for a soft tissue injury? Is there swelling?
 {¶ 102} "A. You mean on initial ER visit?
 {¶ 103} "Q. Or any visit following a soft tissue injury. Could you see swelling?
 {¶ 104} "A. As I say, as — after several days following the accident you will sometimes some swelling, restricted motion. * * *
 {¶ 105} "* * *
 {¶ 106} "Q. * * * An objective finding would be if there's swelling?
 {¶ 107} "A. Correct.
 {¶ 108} "Q. That's something we can see, it's not subjective. * * * Now, on the x-ray report, it does say no soft tissue swelling is seen. Am I reading that correctly?
 {¶ 109} "A. That's correct."
 {¶ 110} Since Murphy addressed the subject of swelling, it was an appropriate subject for closing argument. Further, if any prejudice did occur, it was cured by the trial court's instruction that "* * * closing arguments of counsel are designed to assist you. They are not evidence."
 {¶ 111} There being no abuse of discretion, McBride's fourth assignment of error is overruled.
 {¶ 112} McBride's fifth assignment of error is as follows:
"THE CUMULATIVE EFFECT OF THE COURT'S ERRORS DENIED PLAINTIFF HER RIGHT TO A FAIR TRIAL."
 {¶ 113} "There can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial." State v. Hill (1996), 75 Ohio St.3d 195, 212 (internal citation omitted). Errors which do not prejudice a party's substantial rights "cannot become prejudicial by sheer weight of numbers." Id. (Internal citations omitted). McBride's claim that cumulative errors resulted in an unfair trial is not supported by the record for the reasons discussed above. McBride has not shown that her substantial rights were prejudiced. We find herein ample evidence, including the contradictions in McBride's own testimony and that of her expert, as well as her medical records, for the jury to have appropriately returned a defense verdict due to lack of probable cause and injury.
 {¶ 114} McBride's fifth assignment of error is overruled, and the judgment of the trial court is affirmed.
Grady, P.J. and Brogan, J., concur.